UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNIVERSITY COMMUNITY HOSPITAL,
INC. d/b/a Florida Hospital Tampa

    Plaintiff,

v.                                             Case No: 8:15-cv-628-T-27EAJ

PROFESSIONAL SERVICE
INDUSTRIES, INC.,

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** are Professional Service Industries, Inc.'s Motion for Summary Judgment on Plaintiff's Claims (Dkt. 173) and Plaintiff's response (Dkt. 228), and Plaintiff's Motion for Partial Summary Judgment (Dkt. 209) and Defendant's response (Dkt. 222). Defendant's Motion is DENIED and Plaintiff's motion is GRANTED in part and DENIED in part.

### I.    UNDISPUTED FACTS

Plaintiff University Community Hospital d/b/a Florida Hospital Tampa ("FHT") entered into two consulting agreements with PSI, a geotechnical engineering firm, for geotechnical services in connection with a project to expand its Women's Center and relocate its Emergency Department (the "Project"). (Dkt. 209-1, Exs. 3, 49). Under the agreements, PSI was to investigate site conditions and provide recommendations as to the type of foundation design, and to supervise and monitor the auger cast pile installation, among other things.

The first agreement, dated January 10, 2012, provides that PSI's "Geotechnical and Underground Fuel Storage Tanks Scope of Services" are outlined in "Parsons Original Request for

Proposal Dated December 28, 2011, and Post Addendum No. 01 dated January 18, 2012," which were incorporated therein. (Dkt. 209-1, Ex. 3). Relevant to Plaintiff's claim for breach of contract, the December 28, 2011 RFP requires PSI to perform soil Standard Penetration Tests (SPT) borings, "insure proper boring locations, depth and count," and take all borings to "refusal," "[i]dentify all karst depressions within and directly adjacent to the proposed building site," "[d]efine settlement impacts to adjacent existing structures," and provide foundation recommendations. (Dkt. 209-1, Ex. 267).

The second agreement, dated August 9, 2012, provides that PSI's "Construction Materials Testing and Threshold Inspections Scope of Services . . . are outlined in the Parson's Original Request for Proposal dated July 27 2012" which was incorporated therein. (Dkt. 209-1, Ex. 49). The July 27, 2012 RFP requires PSI to provide "an independent 3rd Party Quality Control element to the other members of the Project Team, in support of the Owner's best interests." (Dkt. 209-1, Ex. 37). This included, among other things, "expediting the 'real time' daily resolution of quality control issues, to include issuance of handwritten daily reports, and to include responsibility and authority to issue recommendations to stop work, if warranted by any critical quality control issue." (*Id.*)

In March 2012, Parson's Commercial Technology Group, Inc., FHT's representative, requested a proposal from PSI to "investigate, and provide a possible reason for the large cracks" in the Women's Center. (Dkt. 209-1, Ex. 9). On March 20, 2012, PSI submitted a proposal noting two areas of concern for sinkhole activity and observations of "horizontal cracking" in the floor slab of the Women's Center and settling of the sidewalk near an elevator bank west of the cafeteria. (*Id.*, Ex. 10). The proposal suggested an approach to determine whether the distress noted was attributable to sinkhole conditions. FHT approved PSI's proposal and authorized PSI to begin the investigation.

(*Id.*, Ex. 9).

On April 2, 2012, PSI issued its "Evaluation of Potential Sinkholes" report following its investigation of the cracking in the floor slab and settlement near the elevator bank at the Women's Center. (*Id.*, Ex. 11). The report indicated that a Ground Penetrating Radar ("GPR") study was performed which indicated no anomalies at either site and that a floor flatness study did not reveal significant differential settlement. (*Id.*) The report concluded that these studies did "not indicate significant existing or active sinkhole issues." (*Id.*)

On May 9, 2012, PSI issued a Geotechnical Engineering Services Final Report with its evaluation results and recommendations for the Project. (Dkt. 209-1, Ex. 12). PSI recommended that an auger cast pile system was a suitable column foundation type. (*Id.* ¶ 3.3.3; Dkt. 24 ¶¶ 20, 23-24). The Final Report also included information regarding potential sinkhole development and found that the site had a moderate to elevated potential for sinkhole development. (Dkt. 209-1, Ex. 12 ¶¶ 2.6, 3.1). Based on PSI's recommendations, the Project was designed by the Project architect and structural engineer, who utilized auger cast piles. (Dkt. 2 ¶ 11). Geotechnical Foundation Systems, Inc. was hired by the construction manager to perform the auger cast piles installation. (Dkt. 24 ¶¶ 14, 28). And pursuant to the August 9, 2012 agreement, PSI was to monitor GFS's installation of the auger cast piles, prepare inspection reports, and report any problems with the installation to FHT.

During construction, around November or December 2012, problems arose with the installation of the auger cast piles. PSI observed ground surface collapse due to sinkholes. (Millburg Dep., Dkt. 178-1 at 213:16-214:6). In January 2013, the foundation of the Women's Center experienced settlement, and installation was stopped. (*See* Dkt. 24 ¶ 31; Millburg Dep. at 261:7-25). As a result, it became necessary to design and implement repairs to the Women's Center building

3

and for additional stabilization to the building. (*Id.* at 266:8-16).

FHT sued PSI for breach of the consulting agreements and professional negligence arising out of the delay in the Project caused by settlement in the foundation of the Women's Center. FHT moves for partial summary judgment on liability for its breach of contract claims (Counts I and III) and PSI's First, Third, Fourth, Sixth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, Eighteenth, Nineteenth, and Twenty-First Affirmative Defenses. PSI moves for summary judgment on all of FHT's claims.

## II. STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)).

## III. DISCUSSION

### A. FHT's Breach of Contract Claims

FHT contends that pursuant to the consulting agreements, PSI was obligated to (i) take bore holes "to refusal" -- that is, until the drill hit rock or similar dense material -- and identify all karst conditions (e.g., sinkholes) on the project site, and (ii) inspect the subcontractor (GFS) installing the auger cast piles to ensure that it performed its work scope in accordance with the Project's specifications, and to warn FHT if it did not. FHT contends that PSI failed to take all of the bore holes to refusal, failed to identify all karst conditions, and failed to inspect the installation of the auger cast piles and report deficiencies in the installation work, thereby breaching its agreements with FHT.

The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). A plaintiff may only recover if the damages are a proximate result of the material breach. *Chipman v. Chonin*, 597 So. 2d 363, 364 (Fla. 3d DCA 1992).

PSI spends a great deal of time attacking FHT's motion and claims with unsupported rhetoric, sarcasm, unsupported conclusions, unsupported "facts," disingenuous arguments, and inflammatory labels such as "false narrative," "newly minted allegations" made out of "whole cloth," and "intentional material misrepresentations."[1] However, the undisputed evidence shows that PSI

---

[1] In this respect, PSI adds nothing to the merits of its argument. The excessive hyperbole is unpleasant and crosses the line on professionalism and civility. See Local Rule 2.04(h) ("Attorneys and litigants should conduct themselves with civility and in a spirit of cooperation in order to reduce unnecessary cost and delay."); Oath of Admission to the Florida Bar (requiring attorneys to pledge fairness, integrity, and civility, not only in court, but in all written and oral communications). As the Federal Circuit has suggested in an appellate context, fully applicable to the trial level in my judgment:
    The parties would be well-advised to take the advice of Justice Scalia and Bryan Garner:
    "Cultivate a tone of civility, showing that you are not blinded by passion.... A straightforward

was contractually obligated to perform certain duties for FHT relating to site investigation and foundation recommendations and supervision, and that PSI failed to do so in at least three ways. Specifically, (i) PSI stopped its borings short of refusal in at least two locations, (ii) failed to locate a karst condition directly under the existing building on the project, and (iii) failed to notify FHT of deficiencies it observed with GFS's installation of the auger cast piles.

To begin with, PSI's contention that FHT "simply made up claims not found anywhere in its Amended Complaint" is without merit. FHT's Amended Complaint alleges the existence of the consulting agreements, references the requests for proposals, and alleges that PSI breached its contractual obligations by "failing to recognize the true nature of the geologic hazards that the subject site posed to the construction of the Project," "failing to perform adequate testing and assessment of the site in May 2012, and later in December 2012 failing to adequately investigate the cause of the observed collapsing of the soils adjacent to auger cast pile installation," and "failing to properly observe and report the activities of the auger cast pile contractor." (Dkt. 2 ¶¶ 7-8, 18, 26-27). While these allegations are not as specific as FHT's contentions in its motion for summary judgment, they were sufficient to put PSI on notice of the claims against it and the factual basis for such claims. And, notably, FHT moved to amend its Amended Complaint to include more specific allegations, which the Court denied because "the proposed 'minor modifications do not add any new

---

recital of the facts will arouse whatever animosity the appellate court is capable of entertaining, without detracting from the appearance of calm and equanimity that you want to project." Antonin Scalia & Bryan A. Garner, Making Your Case: The Art of Persuading Judges 34–35 (2008). *Nissim Corp. v. ClearPlay, Inc.*, 499 F. App'x 23, 27 (Fed. Cir. 2012).

causes of action nor do they modify the relief requested.'"[2] (Dkt. 169).

### i. **Existence of a Valid Contract**

PSI's next contention, that FHT has materially misstated PSI's contractual obligations, is likewise meritless. PSI does not dispute that it entered into the January and August 2012 consulting agreements, but argues that those agreements did not require PSI to supervise GFS' installation of the auger cast piles or to "provide quality control services to [GFS]." However, as set out in the undisputed facts and conceded by PSI, PSI was obligated to provide engineering technicians to observe the auger cast piles installation and report any deficiencies in the work or equipment. (Dkt. 222 at 9).[3] And PSI does not legitimately dispute that it was required to undertake soil borings to refusal, identify all karst conditions within and adjacent to the building site, and provide a soil analysis and foundation recommendations. (*See* Dkt. 222 at 5-8). Accordingly, FHT has established

---

[2] While the motion to amend was denied prior to a response being filed, the Local Rule 3.01(g) certification indicated that PSI opposed the requested amendment.

[3] As Millburg testified, PSI had an inspector onsite to observe the auger cast pile installation:
14 Q Is it fair to say PSI had someone who was
15 onsite full time observing the auger cast pile
16 installation?
17 A Yes.
18 Q What was the reason for that?
19 A Standard practice on auger cast piles they
20 are -- on any kind of deep foundation system, full
21 time inspection is recommended, but especially so on
22 auger cast piles. They can be problematic. There
23 is a lot of things that can go wrong, and you want
24 to be able to document -- have independent
25 documentation of conditions so that if something
1 does go wrong, you can figure out why and come up
2 with recommendations.
3 Q What should we call the person that was
4 onsite full time observing the pile installation?
5 A The inspector, PSI inspector.
6 Q So when I talk about PSI inspector, we
7 will know who we are talking about?
8 A Correct.
(Millburg Dep. at 217:14-218:8).

7

the existence of PSI's contractual obligations and has therefore satisfied the first element of its breach of contract claim.

### ii. Breach

As to the second element, breach, it is undisputed that PSI performed eight borings, but failed to take two of them to refusal. PSI does not argue that it took all eight borings to refusal. Rather, it attempts to gloss over this undisputed evidence by referencing Exhibit B to the January 10, 2012 Consulting Agreement, the breakdown of PSI's compensation, which budgeted for 223 linear feet of borings, or as PSI contends, 28 feet per boring.[4] (Dkt. 161-9 at 9). Regardless, the agreement expressly required PSI to take all borings to refusal, which, as indicated in PSI's Final Report, it did not do. (*See* Dkt. 209-1, Ex. 12 at 73). Indeed, PSI's own expert testified that B5 and B7 were not taken to refusal. (Murphy Dep., Dkt. 176-1 at 103:3-17).[5] Without doubt, PSI's failure to comply

---

[4] PSI's assertion that FHT's structural engineer wanted all exploratory borings to go to a depth of 60 feet is inaccurate. The record citation indicates that the auger cast pile depth should be 60 feet, not the borings depth. (*See* Dkt. 161-5, ¶ F; Dkt. 161-6, ¶ F).

[5] 18 Q Do you see item A,
19 "Borings taken to 19 refusal"?
20 A Yes.
21 Q What does refusal mean to you?
22 A Refusal means that the augers, basically,
23 stop, and you have to use further means to advance
24 the boring.
. . .

3 Q If you look at the boring profiles B5 and
4 B7, you would agree with me, based on those blow
5 counts there, that is not very dense material at the
6 bottom of that boring?
7 A That's true.
8 Q The blow counts are between 11 and 13 and
9 4 on the other one, which is relatively loose
10 material, right?
11 A Four is, yes.
12 Q So B7, unless there is some information we
13 are unaware of, is not depicted on the soil profile,
14 would not be taken to refusal?

with the contractual requirement of boring to refusal was a breach.

With respect to FHT's contention that PSI failed to identify all karst conditions on the site, PSI's April 2012 Evaluation of Potential Sinkholes report issued after its investigation of the floor cracking and settlement near the elevator bank at the Women's Center indicated no anomalies at either side and that the floor flatness study did not reveal significant differential settlement. It concluded that the studies did "not indicate significant existing or active sinkhole issues." It is undisputed, as PSI concedes, that that "[n]o Karst conditions were found by PSI or anyone else." (Dkt. 222 at 7).

But is also undisputed that additional borings in January 2013 by Terracon Consultants, Inc., a geotechnical engineer hired after the settlement, revealed karst conditions under and adjacent to the Women's Center. (*See* Ex. 136; Ex. 366A (correspondence of Andrew Johnson, P.E., identifying sinkhole condition at Terracon's TB-3 borehole at page 14114). PSI does not counter this with any competent evidence. *See* Fed. R. Civ. P. 56(c)(1). Indeed, PSI's September 2013 draft report acknowledged the results of the Terracon borings. And Marty Millburg emailed Lloyd Lasher on September 10, 2013, alluding to the PSI and Terracon borings and the "extensive zones of very poor deep soils from about 100 to 150 feet deep," and opining that "these soils are the cause of this settlement . . . [and] [t]he hospital should perform deep grouting in this area to reduce future settlement."[6]

---

15 A That's true.
16 Q Same with B5?
17 A True.
(Murphy Dep., Dkt. 176-1 at 102:18-24, 103:3-17).

[6] Lasher's reply to Millburg likely could likely be construed by the jury as an admission that PSI should have discovered "the deep void around 100 to 150 feet which may or may not be the cause of the settlement." He offered that disclosing the information "can do us no good," and "[p]roviding the original report or old data that shows there was an unaddressed problem aren't going to help us now. I know they already have all this so there is no

That said, whether PSI materially breached the agreement by failing to identify the karst condition is a question for the trier of fact. If the jury finds that the two borings which were not "to refusal" prevented PSI from discovering the deep soil condition Terracon found, it would be within its province to find a material breach on PSI's part.

In the August 9, 2012 contract, PSI agreed to perform supervisory and quality control inspections during GFS's installation of the auger cast pile foundations at the project. FHT argues that PSI failed to inspect the installation of the auger cast piles and report deficiencies in the installation work, thereby breaching its agreements with FHT. Among other responsibilities, PSI's inspector was to record and notify FHT of "any unusual occurrences during the plie installation," and to "immediately notify the Contractor if a Pile is not in conformance with these specifications." Ben Doan of PSI confirmed that PSI was to "confirm whether things were done compliant or not," and if not, to "document it."

It is undisputed that GFS withdrew (at least two dozen times) augers from the karst areas without grouting, contrary to the specifications for the project. Ben Doan confirmed that "backing that auger out without grouting was inconsistent with the project's plans and specs." And PSI's expert, Murphy, says if the auger was pulled out of its hole without grouting, that should have been reported to FHT. And whether PSI was aware that GFS was improperly installing the augers does not seem to be disputed. PSI plead in its Third Party Complaint against GFS was installing the augers improperly, notwithstanding numerous warnings (Dkt. 24 at ¶¶ 32-33). Philip Harwell of GFS confirms that PSI's inspector observed its removal of augers without grouting, but never voiced any concern or objection.

---

need for us to load the gun sort of speak." [sic]

PSI contends that it repeatedly warned FHT that GFS was installing the auger cast piles improperly by withdrawing the auger without grouting. However, the evidence PSI relies on does not supports this assertion. PSI's reliance on the testimony of John Negley, an assistant vice president for FHT, identifying a November 13, 2012 PSI Inspection Report "reporting on issues with the10 auger cast pile contractor" and that at some unspecified time, he was aware that " the drill rig was removed because of surface collapse" does not create a disputed issue of fact. More specifically, Negley testified that he did not recall seeing any documents that were written prior to the building settling "indicating that [GFS] may have pulled their auger without grouting. (Negley Dep. at 319:12-23).

Cheryl Badinger, an employee of Parsons, likewise does not remember PSI advising her before January 4, 2013 that GFS pulled the auger out without grouting. (Dkt. 148-2, Badinger Dep. at 238:7-16). PSI's Ben Doan does not know whether anyone at PSI recommended to FHT that GFS' work be stopped. (Doan Dep., Dkt. 174-1 at 70:18-71:18). And tellingly, PSI does not cite to any testimony of its own employees demonstrating that PSI warned FHT of GFS' improper auger cast pile installation. The undisputed evidence therefore demonstrates that PSI knew that GFS's installation of the auger cast pile foundations was deficient and not in conformity with the project plans and specifications but failed to report that.

Based on the undisputed evidence, FHT has established that PSI breached the contracts in at least two respects, failing to comply with the contractual requirement of boring to refusal and failing to report deficiencies on GFS's auger cast pile installation. Whether these breaches were

material, and whether they caused damages, will be for the jury to determine.[7]

### iii. **Damages**

PSI's last contention is that FHT has failed to demonstrate how the damages it claims were caused by PSI's breach. PSI asserts that FHT knew about the Project site's sinkhole conditions and prior foundation settlement at the Pepin Heart and Parking Garage project sites, and failed to disclose this information to PSI. PSI further argues that there was no delay in completing the project due to FHT's decision to increase the scope of the Project by building a new Intensive Care Unit on top of the ER facility.

"A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach." *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784 (11th Cir. 1999).[8] It is therefore FHT's burden to proved that its alleged damages were caused by PSI's breach. In other words, FHT must prove that the settlement and resulting delay would not have occurred had PSI taken all borings to refusal, identified the sinkhole underneath and adjacent to the Women's Center, and notified FHT that GFS was improperly installing the auger cast piles. The evidence in this regard is disputed. Tellingly, FHT's argument regarding causation, or, in

---

[7] A number of PSI's additional assertions of "fact" in its motion for summary judgment will be briefly addressed. First, PSI's assertion that it recommended chemical and compaction grouting is not supported by the record and not included in its May 2012 Final Report. PSI's reliance on its February 2012 Draft Report is misplaced, since the May 2012 Report was the final version and was the report FHT relied on. Second, PSI's apparent position that it is significant that it did not make the decision to utilize auger cast piles in the foundation is confusing, considering that PSI recommended using auger cast piles in its Final Report. (*See* Dkt. 173 at 12-13). Third, PSI's assertion that it did not make recommendations in its Final Report for the one-story addition to the Women's Center is flatly contradicted by the Final Report, which describes the Project as follows: "The Emergency Department Relocation project will include a portion of the Women's Center, Imaging Area, Loading Dock and Central Energy Plant at Florida Hospital." (Dkt. 161-4 at 1).

[8] *See also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) ("The contract claims also require a showing of causation. In Florida, a breach of contract claim requires a party to show that damages resulted from the breach.").

other words, whether PSI's breaches were material, is brief. And it is not in fact "obvious" that the failure to identify karst conditions, or warn FHT that the auger cast pile installation was being performed improperly "could," or necessarily did, cause damage to FHT from the structural settling of the Women's Center foundation.[9] Whether PSI's breach actually caused damages to FHT is a question that must be resolved by the jury.

Accordingly, the competing motions for summary judgment on FHT's breach of contract claims will be denied.

### B. FHT's Professional Negligence Claim

In one brief paragraph, PSI moves for summary judgment on FHT's professional negligence claim, contending that because there was no breach of contract, PSI cannot be found to have been negligent.[10] As discussed, summary judgment on FHT's breach of contract claims is not warranted, and therefore, summary judgment will likewise be denied on its professional negligence claim.[11]

### C. PSI's Affirmative Defenses

Finally, FHT moves for summary judgment on PSI's First, Third, Fourth, Sixth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, Eighteenth, Nineteenth, and Twenty-First Affirmative Defenses. PSI did not respond to the motion with respect to its First, Fourth, Ninth, Twelfth, Thirteenth, Fourteenth, Eighteenth, Nineteenth, and Twenty-First Affirmative Defenses. It is therefore apparent

---

[9] While FHT's expert, Devo Seereeram, Ph.D., P.E. may have explained that PSI's errors and omissions caused the settlement of the Women's Center, the citations to his deposition appear to be inaccurate and cannot be located. (*See* Dkt. 228 at 14) (citing pages 309, 339, 340, and 357, which do not exist)).

[10] (*See* Dkt. 173 at 22-23 ("The claims being made by Plaintiff in Count II of its Amended Complaint for professional negligence can only be brought based upon a duty PSI contractually assumed and the breach of such a contractual duty caused Plaintiff's claimed damages. . . . As submitted above, no such breach occurred.")).

[11] PSI's final conclusory arguments regarding malfeasance, agency principles, and the Master Program Management Agreement are confusing and not supported by any analysis or facts. (*See* Dkt. 173 at 23-25). This Court is not required to "search the record and construct every argument that could have been made based upon the proffered materials." *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n.5 (11th Cir. 1995) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995)).

that PSI does not oppose the motion on those defenses. Summary judgment will therefore be granted as to those defenses.

### i. Sixth Affirmative Defense - Barred by Slavin v. Kay, *108 So. 2d 462 (Fla. 1958)*

FHT contends that *Slavin* is not applicable to this action because it is undisputed that the Project was not completed or accepted at the time of the January 4, 2013 settlement. "Under the *Slavin* doctrine, a contractor cannot be held liable for injuries sustained by third parties when the injuries occur after the contractor completed its work, the owner of the property accepted the contractor's work, and the defects causing the injury were patent." *Transportation Eng'g, Inc. v. Cruz*, 152 So. 3d 37, 42 (Fla. 5th DCA 2014) (citations omitted); *see also Foreline Sec. Corp. v. Scott*, 871 So. 2d 906, 909 (Fla. 5th DCA 2004) ("The Slavin doctrine extinguishes the liability of a contractor for a defect by shifting the duty of care originally owed to others by the contractor to the accepting owner as long as any defects are patent."). *Slavin* is inapplicable because FHT is suing PSI for breach of contract and professional negligence which allegedly resulted in damage to FHT. PSI is not being sued for injuries sustained by a third party.[12] Accordingly summary judgment on PSI's Sixth Affirmative Defense will be granted.

### ii. Second, Third, Eighth, and Eleventh Affirmative Defenses - Prior Breach

In briefly referencing its Second, Third, Eighth, and Eleventh Affirmative Defenses, while unclear, it appears that PSI contends that FHT's purported breach of contract, including a breach of its duty of good faith, excuses any breach by PSI.(*see* Dkt. 222 at 13). However, PSI provides little to no analysis to support this argument and as discussed, has not demonstrated a breach of contract by FHT. Not has PSI demonstrated how a breach of contract by FHT relates to the affirmative

---

[12] Notwithstanding, PSI's corporate representative testified that he was unaware of any patent defects in the Project. (Lasher Dep., Dkt. 180-1 at 123:1-21). And it is undisputed that the Project was not completed, and not accepted by FHT, prior to the January 4, 2013 settlement, the defect that is the basis for this lawsuit.

14

defenses of "contract principles and because of the constitutional prohibition against abridging the rights and/or obligations under contract" (Second), failure to mitigate (Eighth) and estoppel (Second and Eleventh). Accordingly, summary judgment on PSI's Second, Third, Eighth, and Eleventh Affirmative Defenses will be granted.

### iii. Tenth Affirmative Defense - Laches

To demonstrate the defense of laches, PSI must prove four elements: (1) conduct on the part of the plaintiff giving rise to the situation of which the complaint is made; (2) failure of the plaintiff to assert his or her rights by suit, even though the plaintiff had knowledge of the defendant's conduct and has been afforded the opportunity to institute suit; (3) lack of knowledge on the defendant's part that the plaintiff would assert the right on which he or she bases the suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the plaintiff or the suit is held not to be barred. *Dep't of Revenue ex rel. Thorman v. Holley*, 86 So. 3d 1199, 1203 (Fla. 1st DCA 2012).

Other than the conclusory statement that "Plaintiff has no excuse for its delay and the prejudice suffered by PSI is obvious," (Dkt. 22 at 15), PSI presents no evidence to support this defense, other than the vague assertions that evidence and documents were lost and experts could not review the site conditions. Based on this alone, it cannot be said that a delay of approximately two years in and of itself constitutes an unreasonable delay that prejudiced PSI.[13] And PSI fails to demonstrate that it lacked knowledge that FHT would assert its contractual rights or otherwise seek to hold PSI liable for its damages, the third element of this defense. Accordingly, FHT is entitled to summary judgment on PSI's Tenth Affirmative Defense.

---

[13] While laches may be applied before the statute of limitations has expired, it applies only under circumstances where strong equities appear. *Smith v. Branch*, 391 So. 2d 797, 798 (Fla. 2d DCA1980). This is not such a case.

15

## Conclusion

Based on the foregoing, Professional Service Industries, Inc.'s Motion for Summary Judgment on Plaintiff's Claims (Dkt. 173) is **DENIED.** Plaintiff's Motion for Partial Summary Judgment (Dkt. 209) is **DENIED** *in part* and **GRANTED** *in part* as to PSI's First, Third, Fourth, Sixth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, Eighteenth, Nineteenth, and Twenty-First Affirmative Defenses.

**DONE AND ORDERED** this 19th day of May, 2017.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of Record